WISWELL, Assignee, *v.* JARVIS and others.

*(District Court, D. Maine. 1881.)*

1. FRAUDS—VOLUNTARY CONVEYANCE BY A HUSBAND TO HIS WIFE—CREDITORS.

A voluntary conveyance by a husband to his wife of a valuable estate is, by the law of the state, *prima facie* fraudulent as to then existing creditors.

2. HUSBAND AND WIFE—VOID AGREEMENTS.

An understanding between a husband and wife that on his death she should have all of his estate for the use of herself and children imposes no legal liability on the husband. Therefore, where a husband, a ship-master, on proceeding to sea makes a conveyance of his property to his wife by way of carrying out such an understanding, the conveyance is without consideration.

3. SAME—VOLUNTARY CONVEYANCE—CREDITORS.

At the time such conveyance was made it appeared that the husband was indebted to the amount of $3,000 only; that he retained of personal property more than fourfold that amount; that for at least four years the creditors could have received their full pay at any moment, he having offered to pay them and they having refused it; and that, subsequently, by extraordinary misfortunes, he lost nearly the entire amount of his personal property. *Held,* that the conveyance could not be set aside by these creditors as being fraudulent and void under the statutes of Elizabeth.

4. REV. ST. MAINE, c. 61, § 1.

Nor can the conveyance be attacked under the provisions of chapter 61, § 1, of the Revised Statutes of Maine, which declares "that when property is conveyed by the husband to his wife without a valuable consideration made therefor, it may be taken as the property of the husband, to pay his debts contracted before such purchase."

*Andrew P. Wiswell, pro se.*

*Henry L. Mitchell,* for respondents.

Fox, D. J. This bill was filed June 22, 1880, by the assignee of Francis H. Jarvis, against the bankrupt and his wife, to set aside a conveyance of a house and lot in Castine, in this district, made by the bankrupt to his father-in-law, Alfred Hovey, on the fifteenth day of March, 1871, and by him conveyed to Mrs. Jarvis on the third day of April of the same year. (Jarvis was, on his own petition, filed August 17, 1878, adjudged a bankrupt by this court.) Said conveyances are charged to have been without consideration, and fraudulent and void, under the statutes of Elizabeth, as to existing creditors, two of whom have proved their debts in bankruptcy, viz.: C. J. Abbott, executor of estate of Jonathan Perkins, deceased, to the amount of $931; and Andrew J. Jarvis, to the amount of $2,147.92. The value of the estate so conveyed is alleged to have been about $5,000. It is also charged that said conveyance was fraudulent and void as to subsequent creditors, and was made with an intent to defeat the provisions of the bankrupt act.

Mrs. Jarvis, in her answer, denies all fraudulent purpose and intent, and alleges that the conveyance was made to her, through the intervention of her father, by her husband, in pursuance of oft-repeated promises by him that he would settle the premises upon her for her share of the property which she had helped to accumulate; that at the time of the conveyance he was in Boston, about to proceed to sea as master mariner, and there executed the deed for the sole benefit of herself and her children, and the same was, on the nineteenth of July, 1871, duly recorded. In her answer she alleges that her husband was, at that time, the owner of more than $15,000 of available property, exclusive of these premises, and that he did not then owe in all more than $3,000. She further states that they were married December 20, 1846; that each year she received from her father large sums of money, for her own separate use and benefit, which she used from year to year for the general support of herself and family, relying entirely upon the representation of her husband "that he was the owner of $10,000 or $20,000 of available property, over and above all his liabilities; that he was doing a good paying business as a ship-master; and that he had made ample provisions so that if he was taken away or lost at sea his whole property would vest in her for the use of herself and four children;" and she believes "that if the various large sums of money which were presented to her by her father had been put at interest they would have amounted to a sum about equal to, or more than, the value of said premises." She further alleges "that after this conveyance her husband offered to pay each of these creditors, Perkins and Jarvis, the full amount due them, but they each requested him to retain the money, paying them their interest, which he did up to 1876," and she believes "they had full notice of the deed to her of the premises, and assented thereto." She alleges—

" That in January, 1872, the bankrupt owned three-fourths of brig Mountain Eagle, of the value of more than $6,000, and was in command of her at that time, with all his nautical instruments on board, of the value of about $500; that this brig, with the property, was then wrecked, with only $1,500 insurance; that he also owned one-fourth of brig Isabella Beauman, which was wrecked in 1873, and her husband thereby lost more than $3,000; that he also invested $2,150 in Castine Brick Company, which was run for three or four years without any dividends or income, and that in 1877, the property of the company not being in excess of its liabilities, he surrendered up all his interest in it, and thereby sustained a cash loss of $2,150; that in 1873 he purchased $4,000 of Western Connecticut Railroad bonds, at 90 cents on the dollar, which subsequently fell greatly in value, and were sold by him in 1877 and

1878 at 15 to 20 cents on a dollar, thereby losing about $3,000, making in all a loss of about $15,000, all subsequent to the date and record of said conveyance."

The answer of Francis H. Jarvis is not so full and detailed as that of his wife. It denies all fraudulent purpose and intent in making the deed; denies that he was then insolvent; and alleges "that he was then worth and possessed of more than $12,000, over and above all liabilities, not including this homestead estate now in question; that his wife received from her father, from year to year, large sums of money for her own use, which she used for the support of the family, upon the belief that he would see that she was fully protected for the future by a transfer of the premises in question: and he believes that if all these sums had been put at interest they would have exceeded the value of the premises." He admits his indebtedness to the two creditors, as set forth in the bill, and that they are still unpaid, but he alleges—

"That as late as 1875 and 1876 he offered to pay each of them all their dues, but that they each informed him they preferred to hold his notes and receive their interest, which he continued to pay them up to 1876; that he always intended and believed he was fully and amply able to pay each of said parties the full amount due to them on demand until he became unable to do so on account of a loss of all the property owned by this respondent from 1872 to 1877."

In the argument in defence it is urged "that the husband became indebted to his wife for the sums she from time to time received from her father, and which were applied by her to the support of herself and children, and that this indebtedness constituted a good and valuable consideration for this conveyance to her." No such claim is made by the wife in her answer. She says the deed was made to her "in pursuance of repeated promises of her husband that he would settle the premises upon her for her share of the property, which she had helped to accumulate." This, in other words, is nothing more than an assertion of a gift to her of the premises, or rather an agreement how he would dispose of his estate; but it is not an averment that she loaned him the sums of money she received from her father, or that she expended them for the common benefit, under a promise that he would repay her therefor, and that this deed to her was thus made in discharge of such liability to her. Taking the whole answer, all that can be gathered therefrom is that there was an understanding between her and her husband that on his death she should have all of his estate for the use of herself and children, and that when

about to proceed to sea, from Boston, this transfer was made in pursuance of this agreement. Such an agreement imposed no legal liability on the husband, did not constitute him in law the debtor of his wife, and does not afford any legal support to this conveyance.

This view is fully sustained by the opinion of *Lowell*, J., in *In re Blandin*, 1 Low. 543, and of *Hunt*, J., in *Humes* v. *Scruggs*, 94 U. S. 22. The case, therefore, is that of a voluntary conveyance of a valuable estate by a husband to his wife, and the question is whether it can stand against an assignee in bankruptcy, representing creditors to the amount of $3,000, whose debts were contracted prior to such conveyance. The law upon this subject is now well settled in Maine, by the decision in *French* v. *Holmes*, 67 Me. 186, where it was decided "that a voluntary gift by husband to his wife, if he be indebted, is *prima facie* fraudulent as to creditors." "This may be rebutted by the circumstances of the case and by proofs, and whether the gift is fraudulent or not is a question of fact, to be determined by the jury."

*In Kehr* v. *Smith*, 20 Wall. 35, the rule as stated by *Davis*, J., is "that a voluntary post-nuptial settlement will be upheld if it be reasonable, not disproportionate to the husband's means, taking into view his debts and situation, and clear of any intent, actual or constructive, to defraud creditors."

In *Kent* v. *Riley*, L. R. 14 Eq. Cas. 190, the marginal note to the decision of the master of the rolls is: "In the absence of actual intent to defeat, delay, or hinder creditors a voluntary settlement made by a settler in embarrassed circumstances, but having property not included in the settlement, ample for payment of the debts owing by him at the time of making it, may be supported against creditors, although debts due at the time of the settlement may to a considerable amount remain unpaid."

What, then, was the bankrupt's condition at the time of this conveyance, on the eighteenth of March, 1871, his petition in bankruptcy not being filed till more than seven years afterwards, viz., August 17, 1878. In his answer he states the entire amount of his liabilities at that date as not exceeding $3,000, and there is no evidence in contradiction of this amount. The bankrupt also says in his answer "he was worth and possessed of more than $12,000 over and above all liabilities, not including the property in question; that he intended to and would have paid all he owed if it had not been for his losses sustained from 1872 to 1877." Mrs. Jarvis states in her answer the property owned by her husband in March, 1871, and what finally

became of it. First she specifies his interest as owner of three-fourths of brig Mountain Eagle, of which he was master, and which, with his instruments, she values at more than $6,000, all of which were totally lost, with an insurance of but $1,500, making his net loss by that disaster amount to $4,500. To disprove the alleged ownership of the husband in this brig, the complainant, at the hearing, produced from the records of the custom-house a copy of this vessel's enrollment, bearing date December 1, 1869, which recited that the bankrupt on that day had sworn that he was the owner of but one-sixteenth of this vessel. The admission of this copy was objected to, on the ground that the paper had never been filed as testimony in the cause, and no notice had been given that it would be produced in evidence; and it was urged that, under the practice in equity in the circuit court, exhibits and documentary evidence must be filed before publication. This case, however, did not proceed under the rules and practice in equity, as established in this circuit, but by an understanding of the parties that it should be heard at the Bangor term upon such evidence as either party might then offer, and witnesses on both sides were then produced and examined orally before the court. This document, therefore, was not inadmissible upon this ground.

By chapter 82, § 100, Rev. St. Maine—

"Copies of enrollments of vessels, or of any other custom-house records or documents deposited in the office of the collector of customs, attested by him or his deputy under seal of office, may be used in evidence and have the same effect as the production of the records in court, verified by the recording officer in person."

Would the original record of enrollment in this case be admissible in evidence, in contradiction of the testimony of the defendants as to the bankrupt's ownership of three-fourths of the Mountain Eagle?

In 1 Greenleaf on Evidence, § 494, it is said:

"Such a document is not of itself evidence of property, except so far as it is confirmed by some auxiliary circumstance showing it was made by the authority or assent of the person named in it, and who is sought to be charged as owner."

This document is found on the files of the custom-house, and recites that the bankrupt had taken or subscribed an oath that he was the owner of one-sixteenth of the Mountain Eagle; but there is nowhere in evidence any copy of such an oath, and the enrollment does not even state before whom it was taken. There is no evidence that the bankrupt ever saw or knew of the paper before it was read at the

hearing; and the court is strongly inclined to hold that, under all the circumstances, it was not admissible for the object contemplated. If, however, it is received, it was not sufficient to establish the falsity of the statements of both of the respondents as to the ownership of the bankrupt in this vessel. Mrs. Jarvis, in her answer, states that he was the owner of three-fourths, and her husband, in his deposition taken August 16, 1880, also swears that in April, 1871, he owned that interest in her. His attention was not called to this enrollment; no explanation was demanded of him in relation to it; but his testimony upon this point was left as originally given by him, without intimation of what was disclosed by the custom-house records.

This enrollment was made December 1, 1869; the deed was given in April, 1871,—more than a year after,—and if the fact was conceded that in 1869 he owned but one-sixteenth, it would not be very cogent testimony to discredit two witnesses who testify that in April, 1871, he was then the owner of three-fourths, as property of this nature is constantly changing ownership. It is also a matter of some importance that there is not produced, from the custom-house, copies of any conveyances of this vessel, or of her register, obtained subsequent to this enrollment, as she was, when lost, sailing on a foreign voyage under a register, or any evidence that the records and files of the custom-house do not disclose that such instruments never existed. In the opinion of the court the evidence does not disprove the ownership of the bankrupt in three-fourths of the Mountain Eagle in the month of April, 1871.

The answer of Mrs. Jarvis and the deposition of her husband assert his ownership, at that time, of one-fourth of the brig Isabella Beauman. This statement the complainant would disprove by a copy, duly attested, from the custom-house, of a bill of sale of the one-fourth of said brig from the bankrupt to Andrew Jackson Jarvis, dated March 8, 1867, and recorded March 19 of the same year. This copy is also objected to. Would the record itself of this deed be admissible as evidence of ownership without any proof whatever of the execution of the original instrument?

Copies of deeds are generally inadmissible to prove their contents. In this state, "office copies of deeds of real estate are admissible in actions touching the realty, but in all other actions the general principle of the law of evidence prevails, that a party offering to prove a fact by deed must produce it and prove its contents." Per *Shepley*, C. J., *Hutchinson* v. *Chadbourne*, 35 Me. 192; *Kent* v. *Weld*, 2 Fairf. 459.

This copy, therefore, was inadmissible, but if admitted would have been wholly insufficient, executed in 1867, to establish that in 1871 the bankrupt was not then owner of one-fourth, when he and his wife had both sworn that at that date he did actually hold that interest in this brig. That he subsequently invested in the brick-yard $2,250, which was apparently a valuable and safe investment, is not questioned. His other property was in bonds,—$4,000 or $5,000,—which in his deposition he says he then held, but which were subsequently, in 1873, converted into Connecticut Western Railroad bonds, costing him 90 per cent., but from which he eventually realized only about 20 per cent. The testimony of John H. Jarvis was "that about a year after the deed was made he sold some government bonds belonging to the bankrupt, and with the proceeds purchased $6,000 of Connecticut Railroad bonds;" thus corroborating the statement of the bankrupt and his wife, and fully satisfying the mind of the court that he was the owner of $4,000 or $5,000 of government bonds, probably the larger sum, as with the proceeds he acquired $6,000 of the railroad bonds at 90 per cent. That there was no actual fraud intended by this deed, is demonstrated by the undisputed fact that a number of years after its date he offered to pay both of the creditors who have proved their claims the full amount he was then indebted to them, which they declined to receive, preferring to retain without any security his notes, and collect their interest from him. There can be but little question that these creditors, one of whom, if not both, was a resident in Castine, in the same town with the bankrupt, must have been aware of this conveyance, and their actions are strongly corroborative of the testimony that the bankrupt was then a man in good credit, of ample means to discharge all his liabilities. To one of these creditors the bankrupt says "he offered a government bond in payment at the then premium." This was the equivalent of cash, as the party could have disposed of it at any moment, and establishes that he was then the owner of such securities, and is in confirmation of the other testimony in the cause.

Upon all the evidence the court is well satisfied that the bankrupt, at the time of this conveyance, acted in perfect fairness towards all his creditors, without any purpose or intent to hinder, delay, or defraud them in any respect; that he was owing but $3,000, and he retained of personal property more than fourfold that amount; that by most extraordinary misfortunes he finally lost nearly this entire sum, without fault on his part; that for at least four years the creditors could have received their full pay at any moment, the

bankrupt having offered to pay them and they having refused it. Under these circumstances, while the result has proved unfortunate to these creditors, they have no good cause of complaint against the bankrupt and should not be allowed to attack this deed to his wife, which was only a reasonable and proper provision for her and her family as then situated.

The complainant invokes the provisions of chapter 61, § 1, Rev. St., which declares "that when property is conveyed by the husband to his wife without a valuable consideration made therefor it may be taken as the property of the husband, to pay his debts contracted before such purchase." This provision was before the supreme court of this state for consideration in *Winslow* v. *Galbraith,* 50 Me. 91, and it was held "that it must not only appear that the property came to the wife from the husband, but that it was fraudulent as to creditors." The case of *French* v. *Holmes,* before cited, is of similar effect.

The result, therefore, is that the complainant fails to sustain his case, and the bill must be dismissed; but as the assignee is without any funds belonging to the estate costs are not awarded against him.